**In the United States District Court
for the District of Kansas**

———————

Case No. 22-cr-40077-TC

———————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

ANGELA DANTZSON,

*Defendant*

———————

**MEMORANDUM AND ORDER**

The Government charged Angela Dantzson with one count of misappropriation by a fiduciary under 38 U.S.C. § 6101. Doc. 1 at 1–2. Dantzson moves to suppress statements the Government obtained from her during an interrogation. Doc. 18. For the following reasons, her motion is denied.

**I**

**A**

The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. It prohibits the government from bringing its power to bear on individuals such that they are compelled to make incriminating, testimonial statements about themselves. *See Fisher v. United States*, 425 U.S. 391, 408 (1976).

To avoid this compulsion, law enforcement must inform a suspect of his or her rights, including the right to remain silent and the concomitant warning that anything said may be used against the suspect in court, before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If law enforcement uses custodial interrogation to elicit an incriminating statement without first properly warning the suspect, the statement cannot be used in the

Government's case-in-chief in a criminal trial. *Id.*; *United States v. Wagner*, 951 F.3d 1232, 1249–50 (10th Cir. 2020).

A defendant bears the initial burden to prove that the Government's conduct implicated his or her Fifth Amendment rights. *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020); *United States v. Ringold*, 335 F.3d 1168, 1171 (10th Cir. 2003). The Government must then prove the defendant's statements were voluntary to avoid suppression of the statements. *See United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020).[1]

**B**

Angela Dantzson serves as a Veterans Affairs fiduciary for a veteran, "S.O." Doc. 18 at 2; Doc. 19 at 2–3.[2] Her activities as a fiduciary attracted the attention of Special Agents Tanner Collins and Timothy Mugrage of the United States Department of Veterans Affairs, Office of the Inspector General. Doc. 19 at 2. Collins and Mugrage interviewed Dantzson at her workplace to "gather information about [her] role as a VA fiduciary." *Id.*

Before meeting with Dantzson, the agents spoke with S.O. Based on their initial conversation with S.O., the agents suspected that Dantzon had misappropriated S.O.'s funds in violation of federal law. And, during their conversations with him, he said he had been threatened by someone with a gun over video. This threat was more a state and local concern than a Veterans Affairs issue. It was also a potential subject of the Dantzson interview. Thus, Detective Derek Child of the Topeka Police Department accompanied Collins and Mugrage when they visited Dantzson.

The interview took place in a private room, was recorded, and lasted approximately 45 minutes. Doc. 19 at 3. Testimony at the suppression hearing clarified that the private room was windowless,

---

[1] The parties presented evidence at a hearing on August 15, 2023. Defendant Dantzson appeared in person and through counsel. The Government presented testimony from two agents from the Department of Veterans Affairs's Office of the Inspector General. Both were involved in the Dantzson interrogation. The parties largely agree on the facts, but disagree about their significance.

[2] Facts are drawn from the parties' briefs, a recording of Dantzson's interview, and testimony at the August 15 suppression hearing.

located in a basement, and that furniture occupied most of the available space in the room.

All three officers sat at one end of a rectangular conference table. They wore civilian clothes. Childs also wore a police carrier, meaning that his gun, badge, and other law enforcement paraphanelia were visible on his person. Mugrage and Collins stated that their shirts covered their guns and badges. Dantzson sat opposite Collins, situated nearest the only door.

Mugrage began by introducing himself, Collins, and Child to Dantzson. Mugrage told Dantzson that they "hoped to chat with [her]" regarding her role as S.O.'s fiduciary. He informed her that their conversation would be recorded and that her supervisor had given permission for her to "take a minute to talk" with them.

After his introduction and before Mugrage asked a question, Dantzson stated that she knew what the interview was about: S.O.'s "money situation." Mugrage replied, "What can you tell us?" and Dantzson explained the situation and stated that she "didn't do anything wrong." Mugrage asked Dantzson about her relationship with S.O. and how she became S.O.'s fiduciary. He confirmed her fiduciary status and asked about her understanding of that role. This exchange—from greeting to "money situation" statement—occurred in fewer than three minutes. Mugrage testified that he did not provide any *Miranda* warning because the situation unfolded so quickly.

Mugrage then asked why $130,000 had left S.O.'s account within the span of two months. Dantzson offered that about $60,000 had been transferred to S.O.'s family. Mugrage asked Dantzson if she had used any of the money on herself, which she denied.

The parties' conversation remained on this topic for several minutes. When Dantzson denied general questions about her use of the money, Mugrage and Collins offered specific possibilities. For example, Mugrage asked, "You didn't buy your daughter a car?" and Dantzson replied, "No," explaining that her daughter already had a car. Dantzson also denied that she had spent the money to open a daycare and to pay off student loans.

Dantzson asserted that she had only disbursed money to S.O. at his request. Mugrage then asked Dantzson if she was aware that disbursing money to S.O. was itself a violation of the law and her fiduciary

agreement. Dantzson demurred, and the conversation returned to her use of the money.

Mugrage told Dantzson that although the investigation was ongoing, it showed that the money did not all go to S.O. Dantzson offered that S.O. was lying about the use of the money. Later, Dantzson told the agents that she had given S.O. money and that he gave it away. She also stated that she had paid some of S.O.'s bills. All of this accounted for $1,100.

The conversation returned to the agents' suspicion that Dantzson's answers thus far had been untruthful. Mugrage contextualized his questions, stating that if Dantzson used the funds for her personal gain or for her family that she could be charged with a crime and repeated that she could be further charged if she lied to investigators during the interview. He then invited her to revisit the question whether she purchased her daughter's car with S.O's money.

Dantzson rebuffed that suggestion, then sat silent. Mugrage continued, saying "Look, don't get your daughter in trouble too here. Make it easy on her by telling us what's up." He asked whether Dantzson's daughter went to the University of Kansas, saying she had "a lot ahead of her" and that he did not want to "knock on her door" and ask her questions but that he would.

Twenty five minutes after walking into the room, Dantzson confessed. After discussing Dantzson's daughter, Mugrage repeated his question whether S.O.'s money was used to buy the daughter's car, and Dantzson said, "Yeah."

Her confession did not end the questioning. Mugrage informed Dantzson, "I picked the easy thing to talk about. Because I knew I could convince you that that's going to be easy to track down. There's more than just the car, Angela." Dantzson objected, and Mugrage said, "I like where we're headed. I don't want to spoon feed you though this whole thing because I don't know every dime you spent." Mugrage then pointed to other large withdrawals and asked where that money went after it was withdrawn. Dantzson said she knew someone would talk to her about the missing money "sooner than later" and that it was "going to come out." She confirmed that she took money out of S.O.'s account and gave it to him when she should not have.

Mugrage concluded the interview by asking if Dantzson had anything further to add to her statement. He asked for Dantzson's phone

number and asked her if she would be willing to cooperate if they had any further questions. She agreed and provided her number. Mugrage said that they would be in touch but would ultimately turn their findings over to a prosecutor, who had discretion whether to bring charges. Mugrage then told Dantzson that they would "let [her] get back to work."

## II

Dantzson's motion to suppress is denied. She was not in custody at the time of her interrogation, so the agents' failure to provide *Miranda* warnings did not violate the Fifth Amendment.

### A

The sole question is whether Dantzson's interrogation was custodial, since the Government concedes that an interrogation took place and that suppression is the appropriate remedy for any *Miranda* violation. Doc. 19 at 6. "An interrogation is custodial when, 'in the light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Wagner*, 951 F.3d 1232, 1250 (10th Cir. 2020) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)); *see also United States v. Cortez*, 965 F.3d 827, 840 (10th Cir. 2020) ("An individual is in custody when a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest.") (citation and internal quotation marks omitted). Several nonexhaustive factors inform whether a reasonable person would have felt free to terminate an interrogation and leave. These include: "the extent . . . the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will," "the nature of the questioning," "the extent police officers 'dominate the encounter,'" and "the release of the [suspect] at the end of the questioning." *Wagner*, 951 F.3d at 1250 (quoting *Howes*, 565 U.S. at 509); *see also United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (analyzing three of the factors that appear in *Wagner*).

**1.** *Wagner*'s first factor—whether Dantzson knew she was free to "end the interview at will"—cuts in favor of custody. 951 F.3d at 1250 (citation omitted). Failure to advise a suspect of their ability to decline to answer or leave is a "significant indication of custodial interrogation." *United States v. Griffin*, 7 F.3d 512, 1519 (10th Cir. 1993). The Government failed to offer this information to Dantzson. Mugrage clearly informed her that the officers had only a few questions and that

her supervisor was willing to let her "take a minute" to talk to them. And he emphasized that the interview was an opportunity for Dantzson to relay her side of the story. But none of the officers told Dantzson that she could decline that opportunity, refuse to offer her side of the story, and leave the room without answering any of their questions.

**2.** Likewise, the nature of the questioning favors the conclusion that Dantzson was in custody. This factor combines multiple aspects of the agents' conduct: the substance of the questions they asked, the way the agents asked those questions, and the length of their encounter with the interviewee. *Griffin*, 7 F.3d at 1518 (contrasting "prolonged accusatory questioning" with the "limited questioning" typical of "*Terry* type investigations"); *United States v. Guillen*, 995 F.3d 1095, 1110 (10th Cir. 2021) (finding that polite questioning for a short period did not suggest coercion, but that accusatory questions were coercive).

The Government's questions were accusatory. The agents interviewed S.O. before speaking with Dantzson and could confront Dantzson with what they learned from him. Thus, Mugrage asked Dantzson numerous times whether she spent the money for her own gain or for the benefit of her family. He often stated that the Government's investigation to that point implicated Dantzson. When Dantzson protested that she had only given the money to S.O., Mugrage informed her that doing so itself violated federal law. Mugrage also informed Dantzson that lying to the agents was a violation of federal law.

Even after Dantzson admitted to wrongdoing, the officers continued to ask case-specific questions. *Griffin*, 7 F.3d at 1519 (finding prolonged accusatory questioning when "questions were case specific" and "continued even after it was obvious defendant was incriminated"); *cf. Jones*, 523 F.3d at 1241–42 (weighing factor against custody when police questioned suspect with the obvious purpose of getting to another person of interest). Dantzson's admission is not itself determinative, since her "environment did not change once the topic shifted." *United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir. 2008) (quoting *Locke v. Cattell*, 476 F.3d 46, 53 (1st Cir. 2007)) ("[N]o Supreme Court case supports [the] contention that admission to a crime transforms an interview by the police into a custodial interrogation."). But the agents' choice to continue questioning her after eliciting a confession marks their questions as accusatory.

Accusatory questions are less coercive when the officers asking those questions are polite. *See Wagner*, 951 F.3d at 1251 (finding that

questioning "directed at soliciting a confession" was not problematic in part because the exchange "remained calm and conversational"); *United States v. Cortez*, 965 F.3d 827, 841 (10th Cir. 2020) (contrasting "polite questioning" favorably with an "intimidating, police-dominated atmosphere"); *United States v. Eckhart*, 569 F.3d 1263, 1276 (10th Cir. 2009) (finding that officers who "were polite in their demeanor and did not use or threaten the use of force at any time" did not escalate a *Terry* stop into custodial interrogation). An interview about possible criminal conduct is undoubtedly tense. And accusations enhance that tension in a way that may implicate the Constitution. Yet *Wagner* and other cases approaching this issue recognize that polite questioning is less likely to cross a Constitutional line. 951 F.3d at 1251. Collins and Mugrage remained calm and professional, so *Wagner*'s second factor weighs less for Dantzson than it otherwise might.

Like polite questioning, limited questioning is less likely to be coercive. The Government interviewed Dantzson for only 45 minutes. Such a short exchange does not suggest coercion. *See Jones*, 523 F.3d at 1238 n.1, 1240–41 (defendant's 45-60 minute conversation with an officer was not ultimately custodial); *Chee*, 514 F.3d at 1114 (weighing the fact that an interview lasted "less than an hour" against custody).

Forty five minutes of polite questioning might not usually constitute a coercive encounter. But these agents' questions were accusatory, even after Dantzson confessed to taking money from S.O. Accordingly, the bulk of the second *Wagner* factor tilts in favor of custody.

**3.** The third factor weighs against concluding Dantzson was in custody because the agents did not dominate their encounter with her. "Officers may 'dominate' an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment[,] appearing in overwhelming numbers," *Wagner*, 951 F.3d at 1250 (citation omitted), or using "language or tone of voice in a manner implying that compliance with the request might be compelled." *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (citation omitted). Although the interview may have been uncomfortable for Dantzson, the environment was not police dominated. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply [because] the police officer is part of a law enforcement system."). "In the paradigmatic *Miranda* situation," a person is arrested in familiar circumstances and then "whisked to a police station for questioning." *Howes v. Fields*, 565 U.S. 499, 511 (2012). In these cases, detention

7

"represents a sharp and ominous change, and the shock may give rise to coercive pressures." *Id.*

Dantzson's was not the paradigmatic *Miranda* situation. Nor was it an analogous situation requiring *Miranda*'s protections. The encounter occurred at her place of work, with her supervisor's permission. That supervisor brought Dantzson to the interview.

Three law enforcement officials waited inside the conference room: Agents Mugrage and Collins, in plainclothes, and Detective Child, who was identifiable as a police officer. *See* Doc. 18 at 2 (describing Child's appearance). The officers' casual appearance reduces the coercive effect of their presence. *See United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998) (holding that an adolescent interviewed at home with his parents by plain-clothed officers was not in custody); *Jones*, 523 F.3d at 1242–43 (finding that four plainclothes officers with concealed weapons did not constitute "[the] threatening presence of several officers"). Childs' gun was visible and he was wearing gear more commonly associated with an armed officer, but he did not draw his weapon or otherwise call it to Dantzson's attention. Agents Mugrage and Collins identified themselves using their badges, but their weapons were concealed by their shirts. Their appearance does not suggest any additional increment of coercion.

Similarly, there were not so many officers present that their sheer number exerted unconstitutional pressure. *Compare Wagner*, 951 F.3d at 1252 (finding that two officers were not coercive), *with United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (finding that a defendant was in custody when "confronted simultaneously by four federal agents"); *see also United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008) (stating that "the threatening presence of several officers" is relevant to the question whether police dominated an environment). Dantzson argues in part that the "presence of multiple agents" led her to believe "that she did not have autonomy" in the encounter. Doc. 18 at 8. But she "was not confronted by [the agents] simultaneously or aggressively." *Jones*, 523 F.3d at 1242. Officers dominate an encounter through shows of force, like "the display of a weapon" or "some physical touching of the person of the citizen." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also United States v. Perdue*, 8 F.3d 1455, 1464, 1467 (10th Cir. 1993) (officers created a coercive atmosphere when they "forced [the defendant] out of his car and onto the ground at gunpoint" and questioned him "while police helicopters hovered above"); *Guillen*, 995 F.3d at 1110 (finding that police did not dominate an exchange where the defendant "was not placed in handcuffs or

8

otherwise physically restrained" and was not "subjected to or threatened with any physical mistreatment"). The agents were a threat in a very broad sense—Dantzson confessed to a crime in their presence, and they enforce the law. But their presence—seated around a conference room at her place of work—was not threatening in a way that would suggest her confession was coerced. Nor was the conference room an unfamiliar, intimidating environment. Although Dantzson was separated from her coworkers in a relatively remote area of the building, she remained at her place of employment during normal working hours while her coworkers were also present. The agents were present only at the invitation of her supervisor. *Cf. Griffin*, 7 F.3d at 1518–19 ("Where police are in full control of the questioning environment, custody is more easily found.").

The agents did not "situtate[] themselves in a way calculated to intimidate." *Jones*, 523 F.3d 1235, 1238 (10th Cir. 2008). In *Jones*, the Tenth Circuit asked in part whether the challenged environment would "intimidate a reasonable person sitting inside." *Id.* at 1243. In that case, the suspect sat in an ordinary car with three agents while a fourth waited outside. *Id.* at 1238. Nonetheless, the court concluded that the agents did not "situate[] themselves in a way calculated to intimidate." *Id.* at 1243. Only one agent spoke with the suspect, meaning "a more plausible assessment of the situation" was that "the two agents sitting in the front seats were there merely to listen to the interview, not to intimidate or block off…exit[s]." *Id.*

A similar scenario unfolded with Dantzson. The recording and agents' testimony reflect that Mugrage asked an overwhelming majority of the questions. Although the officers sat close to Dantzson, the testimony suggests that this was a function of the size of the room that Dantzson's supervisor made available for the encounter. And the officers made sure that she was positioned closer to the door than any of them. Finally, there was no testimony that anyone or anything impeded her ability to leave had she desired to do so.

The agents did not adjust their behavior to intimidate Dantzson, or convert Dantzson's workplace into a police dominated environment. *Wagner*'s third factor does not favor custody.

**4.** The final factor is straightforward. Dantzson was released at the end of the questioning, which weighs against a finding that she was in custody during the interrogation. *See Wagner*, 951 F.3d at 1252 (concluding that encounter was non-custodial in part because agents left without making an arrest). The parties did not dispute this point, and

instead contested the significance of the first three *Wagner* factors. Doc. 19 at 6; Doc. 18.

**5.** It is a close call and an entirely avoidable situation. But on balance, the facts of this case when measured against controlling legal principles suggest that Dantzson was not in custody as would offend the Fifth Amendment. Her environment simply did not present pressures equivalent to those at issue in *Miranda*.

While the Government did not inform Dantzson that the interview was voluntary or that she was free to leave at any time, its agents were cordial throughout the interview and did not "situate[] themselves in a way calculated to intimidate." *Jones*, 523 F.3d at 1243. They questioned Dantzson at her workplace, which was a familiar location. Although the setting was private, she was not "whisked to a police station for questioning" such that her detention was "a sharp and ominous change, [which] may give rise to coercive pressures." *Howes*, 565 U.S. at 511. The Government's questioning was accusatory, but lasted only 45 minutes. And the Government's accusations flowed naturally from Dantzson's own statements. She knew why the agents were there and that they suspected her of wrongdoing. Fewer than twenty minutes later, she confessed to taking money from S.O. Afterwards, Dantzson returned to work—a final sign that she was not in custody. *See id.* at 515.

### III

For the foregoing reasons, Dantzson's Motion to Suppress, Doc. 18, is DENIED.

It is so ordered.

Date: September 1, 2023          s/ Toby Crouse
                                 Toby Crouse
                                 United States District Judge